Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Email: drukavina@munsch.com
Email: jvasek@munsch.com

PROPOSED ATTORNEYS FOR
THE DEBTORS-IN-POSSESSION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| SPARTAN GROUP HOLDINGS, LLC, *et al.*, | § § § § | Case No. 23-42384 |
| Debtors.[1] | § § | Joint Administration Requested |

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF ORDER FACILITATING SECTIONS 362(A) AND 542(A) OF THE BANKRUPTCY CODE**

TO THE HONORABLE BRENDA T. RHOADES, CHIEF U.S. BANKRUPTCY JUDGE:

COME NOW Spartan Group Holdings, LLC; Spartan Concrete Construction, LLC; Spartan Engineering Services, LLC; Spartan Equipment Leasing, LLC; Spartan Fabrication Services, LLC; Spartan Metals Distribution, LLC; Spartan Reinforcing, LLC; and Spartan Valley Chili Road, LLC (collectively, the "Debtors"), the debtors-in-possession in the above styled and numbered bankruptcy cases (the "Bankruptcy Cases"), and file this their *Emergency Motion for Entry of Order Facilitating Sections 362(a) and 542(a) of the Bankruptcy Code* (the "Motion"), respectfully stating as follows:

---

[1] The debtors and the last four digits of the EINs are Spartan Group Holdings, LLC (5865), Spartan Concrete Construction, LLC (5378), Spartan Engineering Services, LLC (9172), Spartan Equipment Leasing, LLC (9972), Spartan Fabrication Services, LLC (1692), Spartan Metals Distribution, LLC (3800), Spartan Reinforcing, LLC (6811), and Spartan Valley Chili Road, LLC (1399).

### I.  SUMMARY

1.  The Debtors are owed more than $6.6 million in prepetition receivables, which the Debtors' clients have withheld payment on due to conflicting payment instructions from certain of the Debtors' alleged creditors.  The Debtors desperately need access to these funds to continue operations and to preserve their going concern and the value of their jobs and contracts for the benefit of everyone, including these same alleged creditors.  Section 542(a) of the Bankruptcy Code provides for the turnover of these funds to the Debtors, and section 362(a) of the Bankruptcy Code prohibits creditors from exercising their alleged rights against the funds.  Thus, the purpose of this Motion is not to create any new injunctive or coercive requirement—sections 362(a) and 542(a) are what they are and they apply to the extent that they apply—but rather, pursuant to section 105(a) of the Bankruptcy Code and this Court's exclusive *custodia legis* jurisdiction, provide a mechanism to the Debtors' account debtors to ensure that they can pay their obligations over to the Debtors without concern of conflicting or multiple liabilities, with all rights, interests, and claims to the receivables attaching to such proceeds with the same validity, extent, and priority as otherwise exists.

2.  This Court, as the centralized forum, can then make all subsequent decisions regarding any interest to the receivables and funds, including the use of the underlying funds as "cash collateral," while all such interests are adequately protected.  Thus, property of the estate is returned to the estates, the Debtors have cash to continue operations (subject to their cash collateral motion), customers and clients are protected against alleged conflicting or multiple liabilities, and all creditors and parties with alleged interests in the receivables are protected by ensuring that the Court can make all appropriate decisions regarding those interests.  The alternative may well be that the Debtors will be unable to reorganize, as they do not have access to their cash, resulting in a liquidation that will be disastrous for all stakeholders, including the Factors (defined below).

## II. PROCEDURAL BACKGROUND

3. The Debtors filed their voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code on December 13, 2023 (the "Petition Date"), thereby initiating this Bankruptcy Cases and creating the Debtors' bankruptcy estates (collectively, the "Estate"). The Debtors have requested joint administration of the Bankruptcy Cases.

4. The Debtors remain in possession of the Estate. No trustee or examiner has been appointed. No official committee of unsecured creditors has been formed.

5. The Court has jurisdiction over the Bankruptcy Cases and this Motion under 28 U.S.C. § 1334. This Motion is a core proceeding under 28 U.S.C. § 157(b)(2).

## III. FACTUAL BACKGROUND

6. Together, the Debtors provide integrated, innovative, high-quality engineering and construction services and solutions. The Debtors provide "turnkey" concrete and reinforcing solutions, from design, to engineering, to fabrication, to pouring, and the Debtors provide highly engineered and specific concrete for a variety of high-end uses. The Debtors also fabricate steel reinforcements and components at their fabrication plant outside of El Paso. Through exclusive contracts, the Debtors are also working toward bringing new, automated concrete and rebar processes and machines to the United States market from Europe.

7. After rapid growth and profitability, the Debtors business saw serious disruption in 2021 and into 2022 due to a dramatic increase in the cost of steel. From the COVID-19 pandemic, to steel tariffs, to global supply chain disruptions—even a major war in Europe—the price of steel increased several fold. The Debtors attempted to lower other costs and pass some of these increased expenses on to their customers, but they were not always successful in doing so and, in most instances, absorbed the unprecedented increase in the cost of goods sold. In turn, this devastated profitability and started a ticking clock of a liquidity crisis in 2023. In an attempt to

address the liquidity crisis, the Debtors took out several extremely high interest "merchant advance" loans—in reality, factors—who raided the Debtors' receivables and bank accounts with daily withdrawals and effective annual interest rates exceeding 200%. This only made the Debtors' liquidity crisis worse and ultimately insurmountable.

8. The Debtors have made material progress towards reducing their expenses, including reducing their workforce. Steel prices have stabilized, and the Debtors' contracts are once again profitable. However, the Factors have instructed various of the Debtors' main customers to divert payments owed to the Debtors to them, which has led these customers to effectively freeze the funds due to conflicting payment instructions and concerns over liability. The Debtors therefore filed their Bankruptcy Cases to protect their assets and their contracts, to free-up their cash and receivables, to provide a centralized forum to adjudicate all asserted lien and security-interest issues, and to consider their strategic options, including sales or a reorganization, for the benefit of all their stakeholders.

9. The Debtors' senior, secured lender is BMO Bank N.A., f/k/a BMO Harris Bank N.A., which claims a first priority security interest in and to all of the Debtors' accounts, including accounts receivables. For purposes of this Motion, the Debtors do not contest the validity, perfection, or priority of said security interests, securing total debt asserted at more than $15 million. As the Debtors' liquidity crisis progressed and worsened, the Debtors obtained cash through various new short term lenders under so-called "merchant advance" agreements, but in reality factoring agreements pursuant to which funds are lent to the Debtors in exchange for which the Debtors provide collateral (not absolute, despite the nomenclature otherwise) assignments of certain receivables to secure the repayment of the loans.

10. Thus, between May and September, 2023, the Debtors entered into various agreements with the following entities (collectively, the "Factors")[2]: (i) Balanced Management, LLC; (ii) C6 Capital Funding, LLC; (iii) Wave Advance, Inc.; (iv) Riverside Capital; (v) Diverse Capital, LLC; (vi) Dynasty Capital 26, LLC; (vii) Redstone Advance, Inc.; (viii) Eminent Funding, LLC; (ix) ProVenture Capital, LLC; and (x) Legacy Capital 26, LLC. While the Debtors paid approximately $4 million to the Factors, the Factors assert that almost $7.5 million remains due and owing (with respect to which the Debtors retain all rights).

11. Certain of the Factors have agreements clearly providing that the transaction is a loan. C6 Capital Funding, LLC, outright calls itself the "lender" in its agreement, and refers to the transaction as a financing agreement—at 201.56% interest at that. The situation with these Factors should not be controversial: the Debtors own the underlying receivables, subject to security interests in favor of the Factor (and such defenses and claims regarding the same as may otherwise exist).

12. Certain of the Factors, however, have agreements purporting to outright assign and sell the Debtors' receivables to them, and disclaiming that the agreements are loans. ProVenture Capital is a good example. The agreement purports to be an outright sale of receivables and disclaims a loan. But then, the agreement also contains a security agreement granting ProVenture Capital a security interest against the receivables, contains various provisions applicable to loans, and contains an alleged personal guarantee. All of these, of course, are indicia of a loan and not a sale under the U.C.C., as discussed below. And, the agreement is purportedly governed by Connecticut law, even though ProVenture Capital is located in New York.

---

[2] The Debtors use the term "factors" in this Motion for ease of reference, without admitting that any of the Factors are true factors who own the receivables. Instead, as pointed out below, the Debtors believe that each of the Factor agreements is a loan and an assignment for collateral purposes, as opposed to an outright sale.

DEBTORS' EMERGENCY MOTION FOR ENTRY OF ORDER FACILITATING SECTIONS 362(A) AND 542(A) OF THE BANKRUPTCY CODE—Page 5

13. As the Debtors understand it through communications with their customers and account debtors, the following clients have withheld payment of at least the following receivables based on instructions from the Factors purporting to require the payment of the Receivables to the Factors:

| | |
|---|---|
| Balfour Beatty Infrastructure, Inc. | $341,240.77 |
| Barton | $219,830.97 |
| Commerce Construction | $1,840,213.00 |
| FraserCon Concrete, LLC | $263,988.36 |
| Kiewit | $712,593.77 |
| Largo Concrete | $266,448.96 |
| Prairie Supply | $140,476.03 |
| Suncoast Post-Tension, Ltd. | $526,149.22 |
| Sundt Construction, Inc. | $532,738.40 |
| MPO Solutions PMCM LLC | $105,020.43 |
| Skyline Forming, Inc. | $1,671,469.96 |

14. As the Debtors further understand it, these account debtors are ready, willing, and able (subject to their own rights against the Debtors) to pay these receivables to the Debtors, provided that they are reasonably assured they would have no liability to any of the Factors on account of such payment (nor can the Debtors imagine any other liability that any of these customers may have to the Factors, there being no privity of contract otherwise).

## IV. **DISCUSSION**

15. The Bankruptcy Code contains a mandatory "turnover" provision. Pursuant to section 542(a) of the Bankruptcy Code:

> an entity, other than a custodian, in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease under section 363 of this title . . . <u>shall deliver</u> to the trustee, and account for, such property or the value of such property, unless such property is of inconsequential value or benefit to the estate.

11 U.S.C. § 542(a) (emphasis added). Pursuant to section 362(a) of the Bankruptcy Code, a person violates the automatic stay by undertaking "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. §

362(a). Subject to cash collateral requirements (which this Motion does not propose to alter), the Debtors' receivables and the payments thereon are clearly funds that the Debtors may use.

16. The foregoing provisions—turnover and the automatic stay—are critical to the operation of the Bankruptcy Code because, among other things, they enable the "pie" to be assembled in order that the Court, as the centralized forum for the adjudication of all related disputes, may decide how to divide that pie.

17. Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Section 105(a) does not create substantive law and it does not authorize the Court to contradict the Bankruptcy Code, but it clearly "authorizes a bankruptcy court to fashion such orders as are necessary to further the substantive provisions of the Bankruptcy Code." *In the Matter of Oxford Management, Inc.*, 4 F.3d 1329, 1333 (5th Cir. 1993). This power also includes the authorization to issue injunctions. *See id*. And, it is beyond dispute that all property of the estate (including arguable property and disputed interests) *is* property of the estate subject to this Court's *custodia legis* exclusive jurisdiction, which means that this Court can fashion any appropriate remedy that is consistent with the Bankruptcy Code to address all competing claims and interests against the *res*:

> The doctrine of *custodia legis* refers to the power of the bankruptcy court to assume complete control over the assets of a bankrupt estate and to prevent any action that would tend to embarrass the court in the equitable distribution of the estate.

*In re Meter Maid Indus. Inc.*, 462 F.2d 436, 438 (5th Cir. 1972).

18. The present situation is precisely the kind where section 105(a) provides the Court with the authority it needs to ensure that sections 362(a) and 542(a) of the Bankruptcy Code are, as a practical matter, complied with before it may be too late. On the one hand, the Debtors need their cash to operate, complete their contracts and projects, and preserve the going concern value

of their businesses. On the other hand, the account debtors are not likely to pay their receivables to the Debtors out of concern of being sued by the Factors. This, in turn, can lead to prolonged litigation after which, even if the Debtors prevail (which they believe they will), their businesses are dead and all creditors have lost. The Debtors could file adversary proceedings and seek preliminary injunctive relief against their own customers and the Factors—and they may well still need to do so—but it is clear that sections 362(a) and 542(a) of the Bankruptcy Code are self-effectuating, injunctive provisions. In other words, the Debtors should not be forced to file adversary proceedings and seek injunctions to command parties to do what the law already obligates them to do. As this Court has held:

> This provision [§ 542(a)] creates an affirmative obligation on the part of the party holding estate property to turn the property over. This affirmative obligation is self-executing and does not require the holding of a hearing or the entry of an order by the bankruptcy court.

*In re Cornerstone Prods. Inc.*, 2007 WL 4298745 at *12 (Bankr. E.D. Tex. 2007) (Rhoades, J.).

19. In sum, without prompt action from this Court and without prompt compliance with the requirements of the Bankruptcy Code, this reorganization may be over even before it has commenced, even though the Debtors are completely correct that they own the receivables and are otherwise entitled to use the proceeds thereof, subject to cash collateral requirements. The Court need only consider the recent example of *Bailey Tool and Manufacturing Co.* to see the Debtors' point. 2021 WL 6101847 (Bankr. N.D. Tex. 2021). There, the prepetition factor refused to turnover or release receivables it allegedly owned, which led to years of litigation, at the conclusion of which the bankruptcy court entered judgment for more than $30 million for breach of contract, fraudulent misrepresentation, and stay violation. But it did not matter: the case had already converted because the debtor could not access its cash and it was the Chapter 7 trustee who secured the judgment, and then had to compromise the judgment for a steep discount because the factor

(like many factors) are fly-by-night entities that cannot respond to a sizable judgment. That is precisely the result that the Debtors and all legitimate creditors should wish to avoid, and that the Bankruptcy Code empowers this Court to protect against.

20. At the same time, the Debtors understand Rule 7001 and questions of due process. That is why they are not seeking substantive determinations by this Motion, or to compel compliance with the Bankruptcy Code any more than such compliance is already compelled, reserving their right to do so by separate proceeding. Thus, any and all claims, interests, liens and encumbrances against the subject receivables would attach to the payments and proceeds thereof, subject to separate litigation regarding the validity, extent, and priority of asserted interests, and subject to the Debtors' ability to seek to use the funds as cash collateral (and to all parties' rights to contest the same).

21. The relief is procedural in nature, except perhaps with the request that an account debtor who pays its receivable to the Debtors be relieved of possible multiple liabilities, but this is clearly a power that the Court has, including by way of interpleader. *See* 28 U.S.C. §§ 1335 & 2361. This includes the power to issue process, grant injunctive relief, and discharge the obligor. *See id*. *See also State Farm Fire & Cas. Co. v. Tashire*, 386 U.S. 523, 534 (1967). The Court has "broad powers" in interpleader. *Rhoades v. Casey*, 196 F.3d 592, 600 (5th Cir. 1999). This includes the entry of an order "restraining the claimants from instituting any proceeding affecting the property until further order of the court." *Id*. at 601.

22. Furthermore, even though the relief requested by the Debtors is mainly procedural, the Debtors are entitled to this relief because they own the underlying receivables and those

receivables must be paid over to them under the Bankruptcy Code notwithstanding any instruction by any of the Factors otherwise.[3]

23. With respect to those Factors where the underlying agreement is a financing agreement and is not styled as a factor or sale agreement, the law is clear that, at most, the Factor may have a security interest against the receivable and that the receivable must be turned over and paid to the Debtors, but subject to such security interest. *See, e.g., In re Contractors Equip. Supply Co.*, 861 F.2d 241, 245 (9th Cir. 1988) (holding that receivable, subject to a security interest and to a prepetition payment instruction, was property of the estate because the payment instruction did not transfer title). In such a case, the creditor's "remedy is through the adequate protection provision of the code." *Id*.

24. With respect to a Factor who alleges that it owns the receivable, the analysis is more complex but ultimately equally as clear that the receivable must be turned over and paid to the Debtors, subject to the Factor's claims, including of ownership or security interest. First, the Debtors note the important Fifth Circuit opinion in *In re Chesnut*, 422 F.3d 298 (5th Cir. 2005). As confirmed by that opinion, property in which the estate claims ownership is "arguable" property of the estate subject to the automatic stay, unless the property is "obviously not" property of the estate (which is not the case here). *See id*. at 303-04.

25. Moreover, to the extent that the Court considers this Motion under the standards applicable to a temporary restraining order or preliminary injunction, the Debtors have a substantial likelihood of success on the merits on their argument that none of the underlying agreements with the Factors constituted a transfer or sale of a receivable and that each was, in fact

---

[3] Again, the Debtors are not proposing to try these issues through this Motion. They point out their arguments regarding ownership only to demonstrate that they have a substantial likelihood of success on the merits and that they will suffer irreparable injury without relief.

and in law, a financing agreement intended to be secured by the receivable. In this respect, the law is clear that an alleged agreement to sell a receivable that is in fact a disguised financing agreement is to be treated as a loan and not an outright sale. As aptly summarized by one bankruptcy court:

> Several factors have emerged through court interpretation of this section of the U.C.C. which indicate when an assignment operates to create a security interest only. A security interest is indicated where the assignee retains a right to a deficiency on the debt if the assignment does not provide sufficient funds to satisfy the amount of debt. A security interest is also indicated when the assignee acknowledges that his rights in the assigned property would be extinguished if the debt owed were to be paid through some other source. Likewise, a security interest is indicated if the assignee must account to the assignor for any surplus received from the assignment over the amount of the debt. Evidence that the assignor's debt is not reduced on account of the assignment is also evidence that the assignment is intended as security. Finally, the contract language itself may express the intent that the assignment is for security only. In contrast, assignments have been found to be absolute transfers where the assignment operates to discharge the underlying debt.

*In re Evergreen Valley Resort Inc.*, 23 B.R. 659, 661-62 (Bankr. D. Maine 1982) (internal citations omitted).

26. The Fifth Circuit agrees, holding that the U.C.C. contemplates a substantive analysis of whether an agreement is an outright assignment or a collateral assignment:

> Reliance's first argument is that the indemnity agreement of July 21, 1977, and the security agreement of April 20, 1978, gave it full title to B & B's accounts receivable from Southern Rock and therefore left nothing for the government to levy upon or file a lien against. Reliance, in other words, characterizes the arrangement effected by the agreements as an absolute assignment rather than the creation of a security interest. This position is flawed. Generally the test for creation of a security interest is whether the transaction was intended to have effect as security. Here both the specific terms-"collateral security" and "security agreement"-and the overall structure of the two agreements could not be more clear: they were meant to give Reliance a security interest, not to make a complete assignment. Under the agreements B & B retained the right to receive the payments from Southern Rock.

*Southern Rock Inc. v. B&B Auto Supply*, 711 F.2d 683, 685 (5th Cir. 1983).

27. The same applies to so-called "merchant advance" agreements that are in reality factoring agreements. For example:

> To determine whether a transaction constitutes a usurious loan, it must be considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it. The court must examine whether the plaintiff is absolutely entitled to repayment under all circumstances. Unless a principal sum advanced is repayable absolutely, the transaction is not. loan. Usually, courts weigh three factors when determining whether repayment is absolute or contingent: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy.

*LG Funding LLC v. United Senior Props. of Olathe LLC*, 181 A.D.3d 664, 665 (N.Y. App. 2020) (internal citations and quotations omitted).

28. Only one factor need be present. *See also Davis v. Richmond Capital Group*, 194 A.D.3d 516, 150 N.Y.S.3d 2, 2021 WL 19146791 (May 13, 2021). Likewise in *Fleetwood Servs. LLC v. Ram Capital Funding, LLC*, 2022 WL 3536128 (S.D.N.Y. 2022), where the debtor was in Texas and the party advancing the money was in New York. This court concluded that the three-part test in *LG Funding* was merely a guide to analysis, and did not dictate the conclusion, and that a court did not need to find all three factors to conclude the transaction was a loan. In that case bankruptcy was a default, but the court also said "there are virtually no circumstances where the accounts receivable would not be sufficient to pay the Purchased Amounts, Richmond would not be absolutely entitled to repayment of that amount by Fleetwood." This court and others tend to focus on who bears the risk of loss if the account debtors fail to pay their accounts. In a true sale, the lender assumes this risk, but in these cases, and in the Factors' agreements here, there is no identification of any accounts, there are several provisions that examine the creditworthiness of the borrower but no provisions pertaining to the creditworthiness of the account debtors, the borrower continues to collect the accounts and gets to retain all proceeds in excess of the daily amount paid to the buyer, all indicating the transaction was a loan and not a sale.

29. *Haymount Urgent Care PC v. Gofund Advance, LLC*, 2022 WL 2297768 (S.D.N.Y. 2022) is also instructive, as it focused on "how the contract at issue allocates risk between the parties." "Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the account is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor," citing a Second Circuit case. In this case none of the three factors in the *LG Funding* case were literally present in the merchant cash advance agreement, but the court nonetheless concluded that the agreement was a loan based on several provisions also found in the Factors' agreements here. The agreement did not identify any particular revenues or accounts that were supposedly purchased, "so there is no transfer of 'risk of non-payment by any specific customer.'" The agreement left the merchant with the responsibility of collecting the accounts and possess the revenues as long as the daily amounts were paid. These and other facts indicated that the "MCA agreements at issue here function as loans."

30. Here, all of the agreements purporting to be absolute assignments and sales are clearly loan and collateral agreements. Among other things: (i) each provides for a security interest; (ii) each provides for liability for repayment if the "sold" receivable is not paid; (iii) each contains a guarantee of payment; and (iv) there is no evaluation of the creditworthiness of the underlying receivable or account debtor. Thus, the Factor does not assume the risk of non-payment as would be the case with an absolute sale, but rather such risk remains with the Debtors. In fact, the Debtors believe that the agreements are in some if not all cases usurious, and they reserve all rights regarding the same.

31. Finally, in certain situations, some of the Debtors' customers make checks for receivables payable jointly to the Debtors and to one or more suppliers or vendors to the Debtors, in effect paying the Debtors' supplies or vendors. The Debtors respectfully request that the

Debtors' customers be ordered to not do so in order to enforce sections 362(a), 542(a), and 549 of the Bankruptcy Code.  First, the receivable belongs to the Debtors and is subject to security interests applicable to accounts and to receivables; the receivable does not belong to a vendor or supplier even if the same has a security interest or lien.  Second, the effect of a check being jointly payable would be to pay the vendor's or supplier's prepetition claim, which the Bankruptcy Code prohibits absent approval from the Court and which would violate section 549 of the Bankruptcy Code.  And, the effect would be to either elevate the vendor or supplier claim to higher priority, including over that accorded to cash collateral, or to have the claim paid from cash collateral without approval.  Third, as proposed herein, any lien or security interest that the vendor or supplier may have would attach to the proceeds of the receivable with the same validity, extent, and priority as otherwise exists, such that, to the extent the vendor or supplier can claim an interest that is superior to that of the Debtor or a cash collateral lender, its rights are preserved and adequately protected.

## V.   PRAYER

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully request that the Court enter an order: (i) granting this Motion; (ii) entering the form of proposed order attached hereto in order to facilitate the Bankruptcy Code while protecting all asserted and competing interests; and (iii) granting the Debtors such other and further relief to which they may be justly entitled.

RESPECTFULLY SUBMITTED this 18th day of December, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
500 N. Akard St., Ste. 4000
Dallas, Texas  75201
Telephone: (214) 855-7500
Email: drukavina@munsch.com
Email: jvasek@munsch.com

**PROPOSED ATTORNEYS FOR THE DEBTORS-IN-POSSESSION**

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that, on this the 18th day of December, 2023, he caused true and correct copies of this Motion, with the proposed order hereon, to be served by U.S. first class mail, postage prepaid, and by e-mail (where indicated) on the parties listed on the attached service list, and by Federal Express, next day delivery, and by e-mail (where indicated), on the following:

| | | |
|---|---|---|
| Diverse Capital, LLC<br>323 Sunny Isles BLVD<br>Suite 503<br>Sunny Isles Beach, FL 33160 | ProVenture Capital, LLC<br>2613 E. 16th St.<br>Brooklyn, NY 11235 | Legacy Capital 26, LLC<br>290 Harbor Dr.<br>Stamford, CT 06902 |
| C6 Capital Funding, LLC<br>8791 South Redwood Road<br>Suite 200<br>West Jordan, UT 84088 | Redstone Advance, Inc.<br>1330Avenue of Americas<br>23d Floor<br>New York, NY 10019 | Riverside Capital NY<br><br>Subs@riversidecapitalny.com |
| Wave Advance Inc.<br>200 South Andrews Ave<br>Suite 504<br>Fort Lauderdale, FL 33301 | Balanced Management, LLC<br>1800 Second St.<br>Unit 603<br>Sarasota, FL 34236<br>jcooper@c6capllc.com | Eminent Funding, LLC<br>369 Lexington Avenue<br>2nd and 3rd Floors<br>New York, NY 10017<br>robert@eminentfunding.com |
| Dynasty Capital 26, LLC<br>700 Canal St 1st Floor,<br>Stamford, CT 06902 | | |

                                                                                             By: /s/  Davor Rukavina
                                                                                              Davor Rukavina, Esq.