Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
500 N. Akard Street, Suite 4000
Dallas, Texas  75201-6659
Telephone: (214) 855-7500
Email: drukavina@munsch.com
Email: jvasek@munsch.com

PROPOSED ATTORNEYS FOR
THE DEBTORS-IN-POSSESSION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| In re: | § § | Chapter 11 |
| SPARTAN GROUP HOLDINGS, LLC, *et al.*, | § § § § | Case No. 23-42384 |
| Debtors.[1] | § § | Joint Administration Requested |

**DEBTORS' EMERGENCY MOTION FOR
INTERIM AND FINAL USE OF CASH COLLATERAL**

TO THE HONORABLE BRENDA T. RHOADES, CHIEF U.S. BANKRUPTCY JUDGE:

COME NOW Spartan Group Holdings, LLC; Spartan Concrete Construction, LLC; Spartan Engineering Services, LLC; Spartan Equipment Leasing, LLC; Spartan Fabrication Services, LLC; Spartan Metals Distribution, LLC; Spartan Reinforcing, LLC; and Spartan Valley Chili Road, LLC (collectively, the "Debtors"), the debtors-in-possession in the above styled and numbered bankruptcy cases (the "Bankruptcy Cases"), and file this their *Emergency Motion for Interim and Final Use of Cash Collateral* (the "Motion"), respectfully stating as follows:

---

[1] The debtors and the last four digits of their EINs are Spartan Group Holdings, LLC (5865), Spartan Concrete Construction, LLC (5378), Spartan Engineering Services, LLC (9172), Spartan Equipment Leasing, LLC (9972), Spartan Fabrication Services, LLC (1692), Spartan Metals Distribution, LLC (3800), Spartan Reinforcing, LLC (6811), and Spartan Valley Chili Road, LLC (1399).

DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL USE OF CASH COLLATERAL—Page 1

## I. SUMMARY

1. By this Motion, the Debtors seek authority to use Cash Collateral (as defined in the Bankruptcy Code): first, on an emergency basis, in the amounts and for the purposes stated in the budget attached hereto as Exhibit "A" in order to avoid immediate and irreparable injury; second, on a final basis, in the amounts and for the purposes to be stated in a final budget to be promptly filed by the Debtors as a supplement to this Motion. One or more creditors assert security interests and liens against the Cash Collateral, including the Debtors' senior, secured lender, BMO Bank N.A., f/k/a BMO Harris Bank N.A. (the "Bank"). The Cash Collateral includes more than $6.6 million in prepetition receivables which have not been paid by the Debtors' customers due to conflicting payment instructions from one or more of the Debtors' Factors (defined below), which is the subject of a separate, pending motion. The Cash Collateral also includes certain cash on hand and the proceeds of all prepetition accounts receivable. In return, the Bank and/or the Factors would receive replacement liens and a superpriority administrative claim, both subject to a Carveout, to the extent of any diminution in the value of their Cash Collateral, against all postpetition property, except Chapter 5 avoidance actions.

## II. PROCEDURAL BACKGROUND

2. The Debtors filed their voluntary petitions for relief under Chapter 11 of the United States Bankruptcy Code on December 13, 2023 (the "Petition Date"), thereby initiating the Bankruptcy Cases and creating the Debtors' bankruptcy estates (collectively, the "Estate"). The Debtors have requested joint administration of the Bankruptcy Cases.

3. The Debtors remain in possession of the Estate. No trustee or examiner has been appointed. No official committee of unsecured creditors has been formed.

4. The Court has jurisdiction over the Bankruptcy Cases and this Motion under 28 U.S.C. § 1334. This Motion is a core proceeding under 28 U.S.C. § 157(b)(2).

### III. FACTUAL BACKGROUND

**A.  THE DEBTORS**

5. Together, the Debtors provide integrated, innovative, high-quality engineering and construction services and solutions.  The Debtors provide "turnkey" concrete and reinforcing solutions, from design, to engineering, to fabrication, to pouring, and the Debtors provide highly engineered and specific concrete for a variety of high-end uses.  The Debtors also fabricate steel reinforcements and components at their fabrication plant outside of El Paso.  Through exclusive contracts, the Debtors are also working toward bringing new, automated concrete and rebar processes and machines to the United States market from Europe.

6. After rapid growth and profitability, the Debtors business saw serious disruption in 2021 and into 2022 due to a dramatic increase in the cost of steel.  From the COVID-19 pandemic, to steel tariffs, to global supply chain disruptions—even a major war in Europe—the price of steel increased several fold.  The Debtors attempted to lower other costs and pass some of these increased expenses on to their customers, but they were not always successful in doing so and, in most instances, absorbed the unprecedented increase in the cost of goods sold.  In turn, this devastated profitability and started a ticking clock of a liquidity crisis in 2023.  In an attempt to address the liquidity crisis, the Debtors took out several extremely high interest "merchant advance" loans—in reality, factors—who raided the Debtors' receivables and bank accounts with daily withdrawals and effective annual interest rates exceeding 200%.  This only made the Debtors' liquidity crisis worse and ultimately insurmountable.

7. The Debtors have made material progress towards reducing their expenses, including reducing their workforce.  Steel prices have stabilized, and the Debtors' contracts are once again profitable.  However, the Factors have instructed various of the Debtors' main customers to divert payments owed to the Debtors to them, which has led these customers to

effectively freeze the funds due to conflicting payment instructions and concerns over liability. The Debtors therefore filed their Bankruptcy Cases to protect their assets and their contracts, to free-up their cash and receivables, to provide a centralized forum to adjudicate all asserted lien and security-interest issues, and to consider their strategic options, including sales or a reorganization, for the benefit of all their stakeholders.

**B.    THE CASH COLLATERAL**

8. Each of the Debtors, whether as obligors or guarantors, and the Bank, are parties to that certain *U.S. $10,000,000.00 Loan and Security Agreement*, dated March 24, 2022. Pursuant to the same, the Bank agreed to lend various funds to the Debtors and the Debtors granted the Bank a security interest against, among other things, all of their "Accounts," "Deposit Accounts," "General Intangibles," and "Inventory." The Bank timely perfected its security interests by filing U.C.C. financing statements against the Debtors on or about March 25, 2022 and, with respect to deposit accounts, by possession. The Bank and various of the Debtors are parties to other agreements, promissory notes, and guarantees as well, pursuant to which the Debtors also granted the Bank various security interests, including to "Accounts," and which the Bank likewise perfected by filing U.C.C. financing statements.

9. Pursuant to the foregoing agreements and instruments, the Bank asserts that it is owed at least $15 million as of the Petition Date.

10. Separate from the Bank, various other creditors may assert security interests in Cash Collateral. As the Debtors' liquidity crisis progressed and worsened, the Debtors obtained cash through various new short term lenders under so-called "merchant advance" agreements, but in reality factoring agreements pursuant to which funds are lent to the Debtors in exchange for which the Debtors provided collateral (not absolute, despite the nomenclature otherwise) assignments of certain receivables to secure the repayment of the loans. Thus, between May and September, 2023,

the Debtors entered into various agreements with the following entities (collectively, the "Factors")[2]: (i) Balanced Management, LLC; (ii) C6 Capital Funding, LLC; (iii) Wave Advance, Inc.; (iv) Riverside Capital; (v) Diverse Capital, LLC; (vi) Dynasty Capital 26, LLC; (vii) Redstone Advance, Inc.; (viii) Eminent Funding, LLC; (ix) ProVenture Capital, LLC; and (x) Legacy Capital 26, LLC.  While the Debtors paid approximately $4 million to the Factors, the Factors assert that almost $7.5 million remains due and owing (with respect to which the Debtors retain all rights).

11. The Debtors dispute that the Factors have perfected interests in the Cash Collateral for various reasons, including that their loans are usurious, that they did not validly perfect their interests, and that the Bank's senior security interest is of such a size that the Factors' security interests have no value and that the Factors are therefore unsecured under section 506(a) of the Bankruptcy Code.  At most, the Factors may have perfected security interests with respect to discrete accounts receivable that are the subject of the underlying agreements and that were assigned as collateral for the loans, but even so those security interest would be junior in priority to those of the Bank.

12. Certain of the Factors have agreements clearly providing that the transaction is a loan.  Certain of the Factors, however, have agreements purporting to outright assign and sell the Debtors' receivables to them, and disclaiming that the agreements are loans.  Here, the Debtors dispute any outright sale or assignment of the underlying receivables, arguing instead that any assignment was a collateral assignment to secure a loan only.  *See, e.g., Southern Rock Inc. v. B&B Auto Supply*, 711 F.2d 683, 685 (5th Cir. 1983) ("the test for creation of a security interest is whether the transaction was intended to have effect as security. . . they were meant to give Reliance a security interest, not to make a complete assignment); *In re Evergreen Valley Resort Inc.*, 23

---

[2] The Debtors use the term "factors" in this Motion for ease of reference, without admitting that any of the Factors are true factors who own the receivables.  Instead, as pointed out below, the Debtors believe that each of the Factor agreements is a loan and an assignment for collateral purposes, as opposed to an outright sale.

B.R. 659, 661-62 (Bankr. D. Maine 1982). *See also* Discussion at ¶¶ 24-30, *Debtors' Emergency Motion for Entry of Order Facilitating Sections 362(a) and 542(a) of the Bankruptcy Code* [docket no. 18].

## IV. DISCUSSION

13. "Cash Collateral" is defined as including "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property." 11 U.S.C. § 363(a). As such, the Debtors' funds on deposit at the Bank and the Debtors' accounts receivables, or rather the proceeds thereof, are Cash Collateral. Pursuant to the Bankruptcy Code, the Debtors may not use Cash Collateral unless "each entity that has an interest in such cash collateral consents," or unless "the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2)(A)-(B).

14. The Debtors do not dispute that the Bank has valid, perfected, and unavoidable first-priority security interests against the Cash Collateral, although the Debtors reserve all rights regarding the size of the Bank's claims(s) and all other issues, including all other asserted security interests or liens of the Bank. However, the Debtors dispute that the Factors have valid, perfected, and unavoidable security interests against the Cash Collateral or that, even if one or more of them do have such security interests, that those security interests have any value in light of the superior security interests of the Bank. Nevertheless, the Debtors are serving this Motion on the Factors and, to the extent applicable, the Debtors seek authority to use any Cash Collateral in which the Factors have an interest.

15. It goes without saying that the Debtors have an immediate need to use Cash Collateral in order to pay for materials, pay employees, pay utilities, and otherwise service their

contracts and customers. Absent the use of Cash Collateral, not only will the Debtors be unable to pay their employees, vendors, and creditors, but they will be unable to generate new accounts receivable, change orders, and contracts. Moreover, because the Debtors provide construction subcontract services, the Debtors' contract counterparties are likely to delay or withhold payment, seek cover damages, withhold retainage, and seek to terminate contracts. And, the Debtors' vendors and suppliers could seek to file M&M liens against the projects, further increasing the risk of damages, setoffs, and claims against the Debtors and further imperiling the Debtors' contracts. In sum, without the immediate use of Cash Collateral, the Debtors are unlikely to be able to reorganize and the Bankruptcy Cases will rapidly become liquidation cases during which the Debtors' receivables and contracts may lose all value. This would devastate the Debtors and their Estate and lead to a loss of value for all creditors, the primary ones being precisely those asserting interests in the Cash Collateral.

16. The Debtors acknowledge that, in order to use Cash Collateral, they must provide adequate protection to the Bank (and possibly the Factors). *See* 11 U.S.C. § 363(e). Whatever the forms of adequate protection may be under section 361 of the Bankruptcy Code, one conclusion is clear: if a lender does not suffer a diminution in the value of its cash collateral as a result of the Debtors' usage thereof, then the lender is adequately protected. Here, all holders of interests against the Cash Collateral are adequately protected for three main reasons. First, the value of the Debtors' receivables will go to almost nothing if the Debtors are unable to finish their contracts, due to setoff, recoupment, cover, and other damages and claims. Thus, using Cash Collateral preserves and enhances the value of the Cash Collateral itself. Second, as a result of using Cash Collateral, the Debtors will be able to free up payments and receivables now held up and will be able to generate new receivables, which will provide replacement liens to all holders of Cash Collateral interests. Third, the Debtors propose to otherwise provide the holders of interests

against the Cash Collateral with replacement liens and superpriority administrative claims against all other property of the estates, except Chapter 5 avoidance actions, and subject to a carveout for United States Trustee fees and for professional fees.

17. The Debtors recognize that, for the first fifteen (15) days after the Petition Date, the Court may authorize the use of Cash Collateral only on an interim basis, and only to "avoid immediate and irreparable harm to the estate." FED. R. BANKR. P. 4001(b)(2). Their budget, attached as Exhibit "A", represents such emergency expenses.

18. The Debtors continue to negotiate a form of agreed cash collateral order with the Bank and will file it of record as soon as they are able.

## V.  PRAYER

WHEREFORE, PREMISES CONSIDERED, the Debtors respectfully request that the Court enter an order: (i) granting this Motion on an interim basis and, upon a final hearing, on a final basis; (ii) authorizing the Debtors to use Cash Collateral on an interim basis pursuant to the Budget attached as Exhibit "A'; (iii) authorizing the Debtors to use Cash Collateral on a final basis; and (iv) granting the Debtors such other and further relief to which they may be justly entitled.

RESPECTFULLY SUBMITTED this 19th day of December, 2023.

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/  Davor Rukavina
   Davor Rukavina, Esq.
   Texas Bar No. 24030781
   Julian P. Vasek, Esq.
   Texas Bar No. 24070790
   500 N. Akard St., Ste. 4000
   Dallas, Texas  75201
   Telephone: (214) 855-7500
   Email: drukavina@munsch.com
   Email: jvasek@munsch.com

   **PROPOSED ATTORNEYS FOR THE DEBTORS-IN-POSSESSION**

**CERTIFICATE OF SERVICE**

      The undersigned hereby certifies that, on this the 19th day of December, 2023, he caused true and correct copies of this Motion, with the proposed order hereon, to be served by U.S. first class mail, postage prepaid, on the parties listed on the attached service list, and by Federal Express, next day delivery, and by e-mail (where indicated), on the following:

| | | |
|---|---|---|
| Diverse Capital, LLC<br>323 Sunny Isles BLVD<br>Suite 503<br>Sunny Isles Beach, FL 33160 | ProVenture Capital, LLC<br>2613 E. 16th St.<br>Brooklyn, NY 11235 | Legacy Capital 26, LLC<br>290 Harbor Dr.<br>Stamford, CT 06902 |
| C6 Capital Funding, LLC<br>8791 South Redwood Road<br>Suite 200<br>West Jordan, UT 84088 | Redstone Advance, Inc.<br>1330 Avenue of Americas<br>23d Floor<br>New York, NY 10019 | Riverside Capital NY<br><br>Subs@riversidecapitalny.com |
| Wave Advance Inc.<br>200 South Andrews Ave<br>Suite 504<br>Fort Lauderdale, FL 33301 | Balanced Management, LLC<br>1800 Second St.<br>Unit 603<br>Sarasota, FL 34236<br>jcooper@c6capllc.com | Eminent Funding, LLC<br>369 Lexington Avenue<br>2nd and 3rd Floors<br>New York, NY 10017<br>robert@eminentfunding.com |
| Dynasty Capital 26, LLC<br>700 Canal St 1st Floor,<br>Stamford, CT 06902 | CT Corporate System<br>As Representative<br>330 N. Brand Blvd., Suite 700<br>Attn: SPRS<br>Glendale, CA 91203 | First Corporate Solutions<br>As Representative<br>914 S. Street<br>Sacramento, CA 95811<br>SPRS@ficoso.com |
| Corporation Service Company<br>As Representative<br>P.O. Box 2576<br>Springfield, IL 62708<br>UCCSPREP@cscglobal.com | | |

                                          By: /s/ Davor Rukavina
                                                Davor Rukavina, Esq.